Filed 4/24/13  P. v. Brown CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055586 |
| v. | (Super.Ct.No. INF10000289) |
| LEE DERRICK BROWN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey L. Gunther, Judge.  (Retired judge of the Sacramento Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed with directions.

Allison K. Simkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan Beale and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Lee Derrick Brown alleges that his trial attorney was ineffective because he failed to object to the imposition of a $10,000.00 restitution fine. We decline to find counsel ineffective, but will remand the matter to afford the trial court the opportunity to exercise its discretion regarding the amount of the fine.

## FACTS AND PROCEDURAL HISTORY

Defendant is a 32-year-old mentally disabled man with a history of criminal behavior. In February 2010, he was on parole and living in a non-operable van in a vacant lot next to an apartment building in Desert Hot Springs where J.G. and her mother A.C. lived in separate units. Sometimes A.C. gave defendant food; sometimes she allowed him to go into J.G.'s apartment to wash his hands or take a shower; in the past she had tried to help him get into a homeless shelter.

On February 21, 2010, while J.G. was away, A.C. let defendant into J.G.'s apartment to wash up. That evening, after J.G. returned home, defendant, who appeared to be "flirting" with her, gave her a "love letter" and became angry when she refused to accept a drink from him or let him spend the night in her apartment. Defendant poured half a bottle of "Cisco" (the alcoholic drink he was offering her) over J.G. and snatched her cell phone out of her hand and threw it in the street when she tried to make a call. The Cisco liquid got into J.G.'s eyes and made them sting. He threatened to have someone "shoot up" her house; he broke a window in the room where her children slept; and, from about 20 feet away, he threw the Cisco bottle at her as she stood outside by her door. Glass from the bottle shattered on the wall about a foot above her head and broken

2

glass and liquor fell into her hair.  J.G. was frightened by defendant's behavior.  Her children screamed as the window in their room broke.

An information filed April 7, 2010, charged defendant with two felonies and two misdemeanors: making a criminal threat (Pen. Code[1] § 422, count 1); assault with a deadly weapon, not a firearm (§ 245, subd. (a)(1), count 2); vandalism (§ 594, subd. (b)(1), count 3); and resisting arrest (§ 148, subd. (a)(1), count 4.)  The information alleged that defendant had suffered a prior conviction for felony vandalism (§ 594, subd. (b)(1)), and had not remained free of confinement for five years subsequent to his release from prison for that offense (§ 667.5, subd. (b)).  The information further alleged that, in 1997, defendant had suffered a conviction for carjacking (§ 666/215), a serious and violent felony.[2]  (§ 667, subds. (c) & (e)(1) and 1170.12, subd. (c)(1).

On September 13, 2010, defendant's lawyer, Joshua Mulligan ("Mulligan"), expressed doubt about his client's competence to stand trial.  Mulligan had had an extensive interview with defendant and had found him to be "very unsophisticated" and his ability to understand and communicate "very limited."  Mulligan had also reviewed defendant's criminal and medical records and noted that he had been found incompetent to stand trial as recently as 2009.  Mulligan asked the court to refer defendant to Inland Regional Center (IRC), where he had previously been a client, for psychological evaluation.  The deputy district attorney, Brad Braaten, did not object to the request, but

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The carjacking appears to have been committed in 1996, when defendant was 16.

wanted a second doctor to also examine defendant. After questioning defendant, the court suspended the criminal proceedings and referred him for the psychological evaluations.

Three reports were obtained. Two were from private psychologists, Dr. William Jones and Dr. Michael Leitman. The third consisted of an update letter from IRC that included a copy of a psychological evaluation of defendant conducted by their psychologist, Dr. Edward Pflaumer, in 2007.

Dr. Pflaumer reported that defendant's IQ was 61; he had never had any formal employment; and he received monthly SSI payments. Dr. Pflaumer also summarized the reports of six other psychologists who had variously found defendant's IQ to be between 53 and 59. The IRC letter said that the only available IRC facility was unlocked and that defendant might not be successful in an unlocked facility and could place others at risk.

Dr. Jones examined defendant at the request of the district attorney's office. He found defendant competent to stand trial, but documented his "limited intelligence" and lack of an employment history.

Dr. Leitman examined defendant at the request of defense counsel. He interviewed defendant and reviewed the reports of Dr. Pflaumer and Dr. Jones. In Dr. Leitman's opinion, "he would not be competent [to stand trial] as defined by Penal Code 1368."

The court held a section 1369 hearing on May 4, 2011. The court indicated that it had read the three reports, had considered defendant's own testimony, and had concluded that he was competent to stand trial.

4

On July 7, 2011, a jury found defendant guilty of all the charged offenses. In a separate hearing on July 8, 2011, the court found the alleged priors true, but deferred sentencing and referred the matter to probation for a report.

*The Probation Report*

The probation report, dated September 30, 2011, documented that defendant had completed 10th grade and had never been employed. His sole source of income was a $900 monthly social security disability payment that he received only when he was not in custody. Included in the report was a statement from defense counsel detailing his client's background as an abused child and mentally-retarded adult who had been "abandoned by his family" and been "treated like a worthless piece of human garbage his whole life," never receiving any effective mental health treatment. Counsel argued that defendant should not be sent to prison, where he would only get worse and likely re-offend when he was released, but to Mental Health Court for possible placement in a highly supervised setting.

The probation officer writing the report expressed empathy with defendant's situation but emphasized that he now had a criminal record that included two strikes and that IRC did not have a facility appropriate for him. The report recommended that defendant be sentenced to state prison and be required to pay, among other costs and fees, $50 in victim restitution, a "restitution fine . . . pursuant to section1202.4" in the amount

of $10,000, and a parole revocation fine pursuant to section 1202.45, suspended unless parole is revoked.[3]

*The Statement in Mitigation*

Meanwhile, on October 21, 2011, defense counsel filed an extended "Statement in Mitigation" reiterating his client's mental status and requesting that he be considered for probation with mental health supervision. Counsel opined that "Unfortunately, in this case and many others, the prosecution opts for the harshest, most costly, and least effective solution."

*First Sentencing Hearing*

At the sentencing hearing on October 21, 2011, the court indicated its feeling that, in view of defendant's violent personality and the "terror" he had generated in the victims of the current crime, "the maximum term is in order." But the court also expressed concern that defendant receive the most just sentence possible. "Quite frankly, I was moved by Mr. Mulligan's statements to the Probation Department, his diligent work and preparation of the statement in mitigation. I'm willing to consider those factors." The court then suspended the sentencing proceedings and referred the matter to the Department of Corrections (DOC) for "diagnosis and a recommendation" pursuant to section 1203.03.

---

[3] The $50 victim restitution fine was for damage to the curtains of a neighbor's window that defendant also, allegedly, broke. The landlord of the building had paid for the window repairs.

6

The DOC study, filed on November 23, 2011, "was prepared with the objective of assessing Mr. Brown's potential for functioning successfully on probation or under other supervision and the level of threat to the community if he should fail to live up to that potential." Under the heading of "work skills" the study said "None . . . ." The report concluded with a recommendation that defendant be committed to state prison because, in view of his history, he would likely be unable to comply with terms of probation and represented a significant risk to the community.

*Second Sentencing Hearing*

At the rescheduled sentencing hearing on January 31, 2012, defense counsel again argued that defendant was a disabled individual who should be sentenced to probation with mental health terms, not to prison. The district attorney responded that defendant's "exposure" was ten years in prison but that the People were requesting only seven. The court said it was not sure that prison was the best place for defendant, but that the DOC recommendation was unequivocal. It did not want to "warehouse" him, but it did not know of any better place for him. Whereupon it sentenced him to seven years in state prison.

The parties then began to discuss defendant's custody credits. Defense counsel was concerned that "the credit rules have changed multiple times. It may work under different tiers. And I don't want him to be deprived of credits." The court agreed: "It would be my intent that Mr. Brown receive every amount of credit that he's entitled to." The court and both counsel agreed to schedule a separate hearing to determine custody credits.

When the discussion moved to the question of fines and fees, the court told defendant (twice) that it intended to impose only the "regular" and "normal" fines and fees "associated with this event" against him. "I do not have those before me at this time." Defendant agreed to accept the fines, although the amounts remained unstated. Both counsel stipulated that the matter of fines would be "discussed when we come back for the credits[]."

Immediately after the stipulation, the district attorney referred the court to page 18 of the probation officer's report for information regarding the fines, and there was an unrecorded "pause in the proceedings." After the pause, the court said simply, "Very well. We are back on the record," and began to read, without comment and almost verbatim, the recommendation section of the probation report. "And . . . there is a recommendation by the probation officer that a restitution fine of $10,000 . . . is provided pursuant to 1202.4 of the Penal Code . . . . Additional parole restitution fine imposed pursuant to 1202.45 Penal Code in the amount of $10,000 is suspended unless parole is revoked."

Defense Counsel Mulligan did not object to any of the fines or fees.

## DISCUSSION

Defendant's sole argument on appeal is that trial counsel was ineffective when he failed to object to the $10,000 restitution fine, which he characterizes as "excessive and unjust." The People respond that the record is insufficient to demonstrate that counsel was ineffective.

8

*Ineffective Assistance of Counsel*

In order to establish a claim of ineffective assistance of counsel (IAC), a defendant must demonstrate (1) that his counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) that the deficient representation prejudiced defendant so seriously as to deprive him of a fair trial. Prejudice is shown when there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's error; a reasonable probability is one great enough to undermine confidence in the outcome. (*People v. Williams* (1997) 16 Cal.4th 153, 214-215, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687, and *In re Avena* (1996) 12 Cal.4th 694, 721, Accord, *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.) Hence, an IAC claim has two components: deficient performance and prejudice. If defendant fails to establish either component, his claim fails.

Here, it is not apparent that Mulligan's performance was deficient or that the outcome for defendant would have been more favorable if he had acted differently. By dint of great effort, he had secured a significantly shorter prison sentence for his client. It is possible that whatever transpired during the unrecorded "pause in the proceedings" caused him to believe that a challenge to the amount of the fine might do more harm than good. On a silent record, we cannot make this determination one way or the other.

The other thing we cannot determine is whether the trial court understood its discretion to impose restitution fines in amounts different from those recommended by the probation officer, and whether it exercised its independent discretion.

9

*Standard of Review*

A trial court has broad discretion to determine the amount of restitution fine to impose, within the statutory range. (*People v. Urbano* (2005) 128 Cal.App.4th 396, 406 (*Urbano*); § 1202.4, subds. (b)-(d).) Nonetheless, "'The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.' [Citations.]" (*Urbano*, at p. 406.) Defendants bear a heavy burden when attempting to show a trial court abused its discretion, but a court's erroneous understanding of its discretionary power is not a true exercise of that discretion. (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.) A failure to exercise discretion may constitute an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847-848.) When a sentencing choice "is based on an erroneous understanding of the law, the matter must be remanded for an informed determination." (*People v. Downey* (2000) 82 Cal. App.4th 899, 912.)

*Section 1202.4*

The version of section 1202.4 in effect when defendant was sentenced provided, in relevant part: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so . . . and states those reasons on the record. [¶] (1) The restitution fine shall be *set at the discretion of the court* and commensurate with the seriousness of the offense, but shall not be less than two hundred forty dollars ($240) starting on January 1, 2012 . . . and not more than ten thousand dollars ($10,000), if the person is convicted of a felony . . . . [¶] (2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to

paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (Former § 1202.4, subd. (b), italics added.)

Subdivision (d) of the statute identifies some of the factors a court should consider in setting the amount of the fine, "including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (§ 1202.4, subd. (d); see also *People v. Dickerson* (2004) 122 Cal.App.4th 1374, 1379-1380.) A defendant's inability to pay is relevant only to the question of how much over the minimum the fine should be, but the fine should be "commensurate with the seriousness of the offense." (§ 1202.4, subd. (b)(1).)

On this record, it is not clear that the court understood and exercised its discretion. Its assurances to defendant that it would impose "only the normal and regular fines and fees" but did not have those in front of it were followed by an almost verbatim reading of the probation officer's recommendations from the page of the report to which it had been

11

referred by the district attorney.  This suggests that the court may not have realized that it, not the probation officer, had discretion to determine the appropriate amount of the restitution fine—i.e. what *it* felt was normal and regular—in light of the factors delineated in section 1202.4.  It is true that a trial court is not required to state its reasons for selecting a certain amount or hold a separate hearing on the matter, but in this case it is not readily apparent that $10,000 would be the "normal" and "regular" fine promised to defendant.

First, the amount bears no obvious relationship to the formula suggested in section 1202.4, subdivision (b).  Calculated under that formula, the minimum of $240 would be multiplied by seven (the number of years in defendant's prison sentence) and that result would in turn be multiplied by two (the number of felonies of which he was convicted), for a total of $3,360.  Despite the fact the formula is not mandatory, the criteria the probation officer used in recommending almost three times that amount for a crime in which no one was physically injured and property damage was minimal, are not apparent.

Secondly, all the information in the report demonstrates that defendant cannot now and is unlikely ever in the future to be able to pay a $10,000 fine.  He is seriously mentally disabled, has never been employed, and, according to the DOC report, has no employment skills.  It is true that when he is not incarcerated he receives $900 per month in a social security disability check, but even assuming those payments will resume when he is released, his ability to live on that amount and pay off a $10,000 fine (or whatever is left after his prison earnings are credited) is virtually non-existent.

Finally, it appears from our review of the record that in the lengthy, complicated, and occasionally hostile[4] proceedings in this case all the entities involved—the probation department, the court, and both counsel—may have simply overlooked facts which might have led to a different amount under the guidelines specified in section 1202.4.

Accordingly, we will remand to give the trial court an opportunity to exercise independent discretion regarding the amounts of the restitution and parole revocation restitution fines imposed reminding the court that it is not bound by the probation officer's recommendation.  (§§ 1202.4, subd. (b) & 1202.45, subd. (a).)

## DISPOSITION

The matter is remanded for the trial court to exercise its discretion regarding

---

[4] The relationship between defense counsel and the prosecutor seems to have been even less cordial than usual, as one sought a restrictive mental health placement while the other pushed for a prison sentence.  See, for example, defense counsel's statement:  "I told the prosecutor's office that they could file for a [Welfare and Institutions Code section] 6500 commitment.  This met with a shrug.  The prosecutor expressed to me some satisfaction that now Mr. Brown has multiple strikes and they can strike him out when he re-offends.  This is an extremely crude way to deal with this situation . . . ."  And, "The prosecution's resistance to mental health solutions in this case is a brain-dead approach that only works contrary to public safety."  At the end of sentencing, when the prosecutor refused to dismiss a trailing misdemeanor, defense counsel promptly set the matter for jury trial causing the court to comment, in an apparent attempt to pour oil on troubled waters, "I'm confident that this matter will be resolved.  I want to give the district attorney's office the opportunity, in light of all that's transpired with regard to the sentencing, to do the appropriate thing."

13

the amounts of the restitution and parole revocation restitution fines imposed.  (§§ 1202.4, subd. (b) & 1202.45, subd. (a).)  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>

J.

We concur:

<u>KING</u>

Acting P. J.

<u>MILLER</u>

J.

14